UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Elaine Chao, Secretary,
United States Department of Labor,

    v.                                            Civil No. 04-cv-82-SM
                                                  Opinion No. 2006 DNH 040
Audrey Karamourtopoulos, DVM, and
Fremont Animal Hospital, LLC,

**O R D E R**

The Secretary of Labor brought suit against Audrey Karamourtopoulos, DVM, and her veterinary hospital, the Freemont Animal Hospital, LLC, seeking damages and other relief on behalf of itself and an allegedly aggrieved employee of the hospital. The Secretary, at the behest of the Occupational Health and Safety Administration ("OSHA"), alleged that Dr. Karamourtopoulos fired a long-time employee, Cheryl Lewis, in retaliation for Lewis's threat to register a complaint with OSHA if Dr. Karamourtopoulos refused to cooperate in having a leased office trailer tested for mold contamination. Lewis worked in the trailer for several months and attributed a number of health problems she experienced to possible mold toxicity.

The parties were unable to settle the matter and a jury trial was held. The jury returned verdicts in favor of the

defendants, Dr. Karamourtopoulos and Freemont Animal Hospital. Defendants now seek attorneys' fees from the government under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) ("EAJA"), arguing that the government's position before and during the litigation was not substantially justified by the facts or the applicable law.  The Secretary objects.  For the reasons set forth below, defendants' motion for attorneys' fees is necessarily denied.

## Background

Cheryl Lewis was a long-time employee of Freemont Animal Hospital.  She served as the hospital's business manager and Dr. Karamourtopoulos's "right hand."  She and Dr. Karamourtopoulos considered themselves to be friends as well.  Evidence at trial tended to establish that Dr. Karamourtopoulos could be difficult on occasion, but that Lewis was generally up to the challenge.

Due to renovations at the hospital, Lewis was temporarily housed in a leased office trailer for a few months, roughly from the end of 2002 through the first few months of 2003.  During that time, Lewis developed – or thought she developed – a number of ailments.  Gradually she came to suspect the trailer environment as the cause of her illness(es), and complained.  Dr.

Karamourtopoulos offered to move Lewis out of the trailer when she first complained, but Lewis stayed on longer.  A few weeks later, Lewis moved from the trailer into Dr. Karamourtopoulos's home (adjacent to the hospital) and then into temporary space in the hospital itself.

Nevertheless, Lewis wanted the leased trailer tested for mold contamination to confirm or disprove her suspicion that mold toxicity was the root cause of her health problem.  She arranged for testing at her own expense.  But Dr. Karamourtopoulos gave Lewis the impression that she was not going to be cooperative, seemingly delaying giving permission to test, while not expressly refusing.  She asked Lewis for information about the testing, and insisted that she be present when the testing occurred, while at the same time not agreeing to any definite time for the testing.  The evidence suggested that Dr. Karamourtopoulos was unfamiliar with employer immunity from suit under New Hampshire's Workers' Compensation Law, N.H. Rev. Stat. Ann. ch. 281-A, and probably feared potential tort liability if the trailer was found to be contaminated.

In any event, Lewis took matters into her own hands and unilaterally obtained some samples from the trailer on a

Saturday, when she was not working. Dr. Karamourtopoulos was offended by what she perceived to be Lewis's going behind her back. Other miscues and miscommunications exacerbated the situation and, on May 20, 2003, the two had a heated argument. Lewis thought Karamourtopoulos was insensitive to her health concerns and was refusing to allow the trailer to be tested. Karamourtopoulos thought Lewis was being disloyal, insubordinate, and perhaps building a case for personal liability. The argument culminated, said Lewis, in her threatening to file a complaint with OSHA if Karamourtopoulos refused to permit testing of the trailer, followed quickly by Karamourtopoulos telling Lewis that she had to "leave right now," and that she could not go into the hospital, but had to "have someone get your things." Lewis understood that she had just been fired.

After Lewis retrieved her belongings, but before she could leave, Karamourtopoulos approached her. A lengthy conversation ensued in the hospital's parking lot. Nothing was resolved, and Karamourtopoulos says Lewis quit, despite her having asked Lewis not to do so. Lewis maintains that Karamourtopoulos never asked her to come back to work and that she was fired (and remained fired) because she threatened to complain to OSHA.

4

Lewis filed a complaint with OSHA.  An OSHA field investigator, after looking into the matter and interviewing potential witnesses, recommended that the complaint be dropped because, she determined, there was insufficient evidence to support the conclusion that Lewis was fired as opposed to voluntarily quit.  That recommendation was reviewed in the normal course by an OSHA senior investigations manager, who thought the initial investigation inadequate.  He asked for additional information.  After obtaining and considering the additional information, the senior investigator thought Lewis's complaint might have merit.  Accordingly, he and Department of Labor Attorney David Baskin (who later represented the Secretary in the civil case) re-interviewed Lewis.  They found her to be credible and, after assessing all of the circumstances, decided to press a claim for retaliatory discharge under Section 11(c) of the Occupational Health and Safety Act, 29 U.S.C. § 660(c).  Dr. Karamourtopoulos was not re-interviewed because, in the senior investigator's view, the file "already contained a detailed letter from her, in which she carefully set forth her position."

Both OSHA's senior investigator and legal counsel understood that the retaliatory discharge case turned on whether a jury would credit Lewis's testimony, and find that Karamourtopoulos's

5

orders to Lewis – i.e. "leave right now" and do not go into the hospital but "have someone get your things" – constituted a discharge, as well as whether, given the close temporal proximity between Lewis's threat to call OSHA and Karamourtopoulos's statements, a jury would find the discharge to have been in retaliation for Lewis's invocation of her right to complain about work place safety to OSHA.  Because, in their opinion, a jury would likely credit Lewis, and because other evidence tended to support Lewis's complaint, they decided that a provable case of retaliatory discharge existed.

    The parties differ markedly about the process from that point onward – each blaming the other for the necessity of filing suit and the lack of meaningful progress toward pretrial settlement.  The government says defendants, through counsel, refused to discuss the matter in response to its formal notice of intent to sue, instead expressing a preference for exercising full discovery rights after suit was filed.  Defendants say the government filed suit precipitously and without a solid basis.  They also claim they were afforded no real opportunity to discuss settlement, given the government's firm but unreasonable demands for $200,000 in compensation for Lewis and a posted admission of Labor Law violations in the workplace.  Each side also points to

the other as being unreasonably inflexible in pretrial negotiations (such as they were).  The government says it was willing to mediate the dispute before the Magistrate Judge, but defendants declined.  It also says defendants refused to make a reasonable offer and plainly expected the government to "bid against itself."  Defendants say they made no serious settlement proposals because the government's position was so unrealistic, and because they were convinced they had done no wrong.

### Analysis

Defendants are prevailing parties and therefore are entitled to recover their attorneys' fees from the government under the EAJA, unless the government can establish by a preponderance of the evidence that its position was substantially justified. McDonald v. Sec'y of Health & Human Servs., 884 F.2d 1468, 1475 (1st Cir. 1989).  That is, the government must establish that its position, both administratively and in litigation, had a reasonable basis in fact and law, and was "justified to a degree that could satisfy a reasonable person." Id. at 1475 (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).  Both the government's underlying position (administratively), and its litigation position are to be evaluated, as a whole, in determining whether its actions as to these defendants were

substantially justified.  McDonald, 884 F.2d at 1475-76.  And, of course, the government's settlement position ought to be considered as well.  Dantran, Inc. v. U.S. Dept. of Labor, 246 F.3d 36, 44 (1st Cir. 2001).

For EAJA purposes, "substantially justified" does not mean "justified to a high degree, but rather justified in substance or in the main . . . ."  Pierce, 487 U.S. at 565; see also Dantran, 246 F.3d at 51-52 (Selya J., dissenting).  In addition, the fact that the government loses a case at trial, as it did here, does not create a presumption that its litigation position was not substantially justified.  Id. at 40 (citing Pierce, 487 U.S. at 569).

Here, defendants advance three major points.  They say the Secretary should not have gone forward with this enforcement action because the initial field investigator recommended against proceeding; that the Secretary's pretrial settlement position (demanding $200,000 in damages and posted notices in the workplace conceding the alleged labor law violation) was unreasonable; and, finally, that the Secretary's litigation position was unreasonable in that the government failed to offer evidence at trial supporting its theory that Dr. Karamourtopoulos

"had impeded or interfered with Ms. Lewis's efforts to test the trailer [for mold]."  (Actually the government's theory was that Dr. Karamourtopoulos fired Lewis in retaliation for invoking her right to complain to OSHA.  It offered evidence of Karamourtopoulos's resistence to testing as support for its claim that Karamourtopoulos was concerned (albeit incorrectly) about her personal liability exposure and so had a motive to fire Lewis for threatening to call OSHA.)

   The court is not unsympathetic to defendants' plight.  Dr. Karamourtopoulos believed she had done nothing wrong; the government gave her some reason to think, early on, that an enforcement action would likely not be pursued; she refused to give in to Attorney Baskin's seemingly overreaching demand for a very large sum of money in what most lawyers would think a low-dollar-value case (particularly after discounting for the obvious trial risks); and she prevailed against the government at a jury trial.

   All of which is to say that Dr. Karamourtopoulos is entitled to some sympathy, and respect, for standing up to what no doubt appeared to her to be an overbearing bureaucracy exercising poor judgment, making severe demands seemingly designed to preclude

9

rather than encourage a reasonable resolution of the dispute, and seemingly bent upon turning a transitory, albeit bitter, argument between friends who had an employer-employee relationship into a major (and expensive) OSHA retaliatory discharge case.

But, as noted in <u>Wilfong v. United States</u>, 991 F.2d 359, 365 (7th Cir. 1993), that the object of an enforcement action properly stands up against the government and prevails in litigation brought by it, at significant personal expense, does not bear on whether the government's enforcement action was "substantially justified" within the meaning of EAJA.  Congress did not see fit to waive sovereign immunity with respect to fee awards for all parties who prevail against the government in litigation, but only in those cases where the government's action was not substantially justified.

In the end, although the court would have preferred to see a less hardened litigation approach, a less aggressive settlement posture, a more reasoned and conciliatory effort by government counsel to resolve the dispute on better terms for Ms. Lewis (and less expensive ones for Dr. Karamourtopoulos), and a more sober assessment of the realities of the case, still, it cannot be said

that the government's position was not substantially justified within the meaning of EAJA.

Under Section 11(c) of the Occupational Health and Safety Act, the Secretary of Labor is duty-bound to protect employees from being discharged in retaliation for exercising their rights to workplace safety as enacted by Congress.  Here, the government was faced with a situation in which an aggrieved long-time employee complained that she was fired immediately after she threatened her employer with an OSHA complaint if the employer did not consent to environmental testing of the workplace for toxic substances (at the employee's own expense).  A senior OSHA investigator and OSHA legal counsel determined, after personally interviewing the employee and reviewing the investigative file, that the complainant was credible, that developed evidence was consistent with, even corroborative of the alleged victim's story, and somewhat inconsistent with the employer's claim that the employee voluntarily quit.  The employee, they determined, was fired, and was fired because she invoked her rights under the Act.  They also determined that they had a triable case, since it would turn on credibility, and they thought in good faith that they had both a credible complainant and supporting evidence.

The jury, after a full exposition of the facts, disagreed. It credited defendants' version of the critical events (or accepted defense counsel's persuasive argument, that even if the employee was fired and did not quit, still, her discharge was not due to her passing comment about a possible complaint to OSHA). To avoid the imposition of fees in this case, the government invokes authority holding that when a trial verdict necessarily turns on a jury's assessment of witness credibility, as it assuredly did here, it cannot be said that the government's position was not substantially justified.  See Wilfong, 991 F.2d at 368.  That seems a common sense principle, perhaps not true in all cases – one can readily imagine OSHA unjustifiably relying upon an inherently incredible witness in bringing an enforcement action – but true in this case.

Nothing in the record suggests that facts or circumstances existed that fairly put the government on notice that proceeding on the strength of Lewis's version of events was either unsupportable or unrealistic.  She was not an inherently unreliable witness.  The jury could have supportably found, on the evidence presented, that Lewis was fired, and was fired because she insisted on mold testing, and threatened to go to OSHA if her employer did not permit it.  It did not so find, but

all that can be said about the verdict with confidence is that the jury necessarily determined either that Dr. Karamourtopoulos was right, or that Lewis was fired but not because she threatened to complain to OSHA, or simply that the government failed to meet its burden of proof.

The government was also not unjustified in proceeding administratively over the initial recommendation of its field investigator – higher levels of review are an inherent fact of the administrative process, and superiors are generally not bound to act consistently with a subordinate's recommendation.  The initial investigator may have thought (correctly it turns out) that the case would be difficult to prove, given that it came down to opposing stories and not much corroborating evidence favoring one or the other.  Nevertheless, OSHA's senior investigator and legal counsel were entitled to review the matter and decide for themselves whether they had a triable case, including whether Lewis was, and would be perceived by a jury to be, credible.  They were not required to re-interview the employer or anyone else before deciding to pursue the matter on behalf of the allegedly aggrieved employee; they had the entire case file to review, and they satisfied themselves with regard to the one issue they thought critical.  The issue for them was, "Do

we have a presentable, supported case?"  Their determination that they did was fairly grounded in the facts as they plausibly understood them to be.

Finally, the government's settlement position was not unreasonable given the circumstances – somewhat ambitious perhaps, but not so far outside the boundaries of reasoned analysis as to be abusive or oppressive, in the sense that the government unjustifiably forced defendants, as a practical matter, to go through a punitive trial at great expense.  First, the government's estimation of Lewis's lost wages claim was facially reasonable.  If the jury accepted her testimony and credited her position that she would have been afforded some flexibility by defendants with respect to her work hours, given her deteriorating post-termination medical condition (which was not related to mold toxicity but rheumatoid arthritis), approximately $60,000 in actual losses was probably high but in the ballpark.  The punitive damages demand of roughly $140,000 was also high (and not one conducive to actually resolving the case) but, again, not irrational or unwarranted given that a jury could have credited Lewis's testimony and might have found a deliberate, intentional, and punitive discharge that was not only unlawful but personally traumatizing to Lewis as well.  The

government's assessment of its likelihood of success was not, in the court's opinion, very astute, but neither was it irrational.

Moreover, as government counsel points out, defendants were equally firm in stressing that they would not concede any violation of the law, would not pay a substantial sum to settle the matter (defendants only offered to reimburse Lewis for the $1,200 in mold testing costs she incurred), and did not offer to reinstate Lewis.  As a consequence, defendants put the government in the position of "bidding against itself" with respect to negotiating a settlement.  It was the court that encouraged a new settlement demand from the government at the final pretrial conference – the defendants did not invite one with a new and more realistic offer.  The government was also willing to mediate the dispute before the Magistrate Judge, but defendants declined.  While the court would certainly have preferred the government to have gone the extra step and present a demand likely to settle the matter on reasonable terms for both sides, the government was not obliged to do so to avoid the imposition of fees under EAJA.  And, of course, defendants likewise did not put forward an offer likely to have actually resolved the dispute.

The parties were of decidedly different views on the likely outcome, and each had a basis for thinking it would prevail.  The government lost to a well-presented defense and well-argued summation.  But it cannot be said that the government acted without substantial justification, either administratively or in litigating this enforcement action.

The motion for attorneys' fees (document no. 64) is, therefore, necessarily denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 31, 2006

cc:  David L. Baskin, Esq.
     Debra W. Ford, Esq.
     Donald L. Smith